UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANA REGINA DOMINGUEZ,

Plaintiff,

v.

NANCY A. BERRYHILL,

Defendant.

Case No. 16-cv-01936-DMR

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 20, 25

Plaintiff Ana Regina Dominguez moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Plaintiff not disabled and therefore denied her application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et seq. The Commissioner cross-moves to affirm. For the reasons stated below, the court denies Plaintiff's motion and grants the Commissioner's motion.

I.      **PROCEDURAL HISTORY**

Plaintiff filed an application for Social Security Disability Insurance (SSDI) benefits on June 28, 2011, which was initially denied on March 12, 2012 and again on reconsideration on December 5, 2012. Administrative Record ("A.R.") 208-209, 102-106, 109-114. On December 6, 2012, Plaintiff filed a request for a hearing before an Administrative Law Judge (ALJ). A.R. 115. ALJ Mary P. Parnow conducted a hearing on April 3, 2014 at which Plaintiff testified, along with a medical expert and a vocational expert ("VE"). A.R. 66-98. The ALJ held a second hearing on May 1, 2014, at which Plaintiff and the VE testified. A.R. 39-65.

After the hearings, the ALJ issued a decision finding Plaintiff not disabled. A.R. 17-32. The ALJ determined that Plaintiff has the following severe impairments: "a seizure disorder, status post brain tumor resection, an adjustment disorder and a cognitive impairment." A.R. 23. The

ALJ found that Plaintiff retains the following residual functional capacity (RFC):

> [Plaintiff is able] to perform a full range of work at all exertional levels but with the following nonexertional limitations: a need to avoid objects coming from the periphery of her vision, a need to avoid work at unprotected heights and around dangerous moving machinery, a preclusion against work involving public contact, the ability to avoid known, common hazards in the workplace, the ability to perform simple tasks with routine supervision, the ability to relate to supervisors and peers on a superficial work basis and the ability to adapt to work situations.

A.R. 25.

Relying on the VE's opinion that an individual with such an RFC could perform other jobs existing in the economy, including cleaner/housekeeper (commercial or institutional), cleaner (manufactured buildings), and hand packager, the ALJ concluded that Plaintiff is not disabled. A.R. 30.

The Appeals Council denied Plaintiff's request for review on February 9, 2016.  A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).  Plaintiff then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.     THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1]  and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

1.     At the first step, the ALJ considers the claimant's work activity, if any.  If the

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.  At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.  At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.  At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.  At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    Plaintiff's Testimony

Plaintiff is a 61 year old woman (57 years old at the time of the 2014 hearings) who was diagnosed with a brain tumor in 2007. She underwent surgery for the tumor's removal in 2007. A.R. 74-75. Following her return to work after surgery, Plaintiff felt better but then began to experience "kind of . . . a relapse," including having the same symptoms she had had before, such as hearing voices and having "sensations in [her] body that [she] had to get up." A.R. 75. She also had a pulmonary embolism. A.R. 75. In 2010, Plaintiff stopped working after 27 years as a secretary for a health insurance company. A.R. 71-72.

Plaintiff feels the sensations in her back and legs, and they are worse at night. She described them as "grab[bing] her leg" and "touching [her], so [she] ha[s] to get up." A.R. 76. According to Plaintiff, the sensations "squeeze" and "push" her arms and legs, and the sensations in her legs are painful. A.R. 82. Plaintiff also testified that she has sensations that "poke [her] eyes," which is painful and leaves her vision blurry. A.R. 84-85. Plaintiff sleeps only three or four hours per night. A.R. 82.

As to the voices she hears, Plaintiff testified that they are unrecognizable and "constant," and that she hears both a man's and a woman's voice. She has learned to ignore them. A.R. 76-77. The voices make it difficult for her to concentrate while reading, and leave her confused. A.R. 76, 82. Plaintiff testified that the voices are worse at nighttime, and she screams for them to leave her alone. A.R. 83. If the voices interrupt her when she is alone, she "get[s] up and leave[s]," and walks and does deep breathing. A.R. 83. Plaintiff testified that it takes her longer to do things than it used to, because she gets interrupted by the voices and sensations. A.R. 83-84. The voices and sensations are "very bothersome" and frustrating. A.R. 84. She also is very forgetful. A.R. 84.

Following her doctor's instructions, Plaintiff does not drive due to seizures. A.R. 86. Plaintiff testified that she experiences seizures two or three times per week, for five minutes at a time. She testified that she falls down "and then I stop breathing myself with my sticking out my tongue," and then gets very weak. A.R. 86. Plaintiff's vision becomes blurry and she feels strong smells during the seizures. A.R. 90-91. Following a seizure, Plaintiff has to lie down for a period between a half hour to one hour. A.R. 58. She also feels pressure in her head, "like they smash my head." A.R. 86. This sensation is different from a headache; Plaintiff described it a burning sensation in her head. A.R. 87. She stated that she has more bad days than good days. A.R. 88. Plaintiff also testified that she has panic attacks about twice per month. A.R. 87.

Plaintiff was taking Depakote but stopped in 2012 due to lack of insurance. She does not take any medications for her mental health. A.R. 90.

4

## B.    Relevant Medical Evidence

### 1.  Dr. Ronald DeVere, M.D.

Medical expert Dr. Ronald DeVere testified at the April 2014 hearing.  A.R. 77-81.  Dr. DeVere, a cognitive neurologist, testified that Plaintiff has a seizure disorder due to temporal lobe epilepsy, and that "the consequences of that . . . could be cognitive impairment."  A.R. 78.  As to Plaintiff's cognitive functioning, Dr. DeVere noted that Plaintiff "had a good battery of neuro psych testing" in October 2012 and that "she was functioning pretty good cognitively."  A.R. 79 (citing Ex. 28F, A.R. 537-541).  He further noted that Plaintiff has "some mild depression [and] stress," but stated his opinion that "there was no cognitive reason why [Plaintiff] couldn't do a job," and that "[s]ome of it may be psychological."  A.R. 79.  Dr. DeVere opined that based on her medical records, Plaintiff "should be able to do certainly light duty as a . . . minimum," with restrictions, including no exposure to unprotected heights or working with machinery, no climbing ladders or scaffolds, and no driving if Plaintiff has more than one seizure in a six month period.  A.R. 79.

### 2.  Dr. Carol W. Fetterman, Ph.D.

Dr. Carol W. Fetterman, Ph.D., performed a psychological testing evaluation of Plaintiff on October 16, 2012.  A.R. 537-541.  Plaintiff reported "mental health symptoms and cognitive impairments of long term memory loss due to brain tumor," as well as depression and anxiety. She also reported to Dr. Fetterman that she had previously had paranoia and hallucinations until she was put on medication, and that these symptoms "are moderately disabling," but that she currently felt "okay."  A.R. 537.  Dr. Fetterman noted that Plaintiff reported physical limitations due to seizures and brain surgery, but that Plaintiff was independent for activities of daily living, including preparing simple meals and making change at the grocery store.  A.R. 538.

Dr. Fetterman reviewed Plaintiff's medical records and administered a mental status exam and other tests.  Plaintiff was alert, fully oriented, pleasant and cooperative.  Dr. Fetterman assessed her intelligence as "fair," with a full scale IQ of 76, in the borderline range of intellectual functioning.  A.R. 538, 539.  Her concentration and memory were fair, with her attention impaired.  Her fund of knowledge was adequate for current events.  A.R. 538.  Her thought

content was "unremarkable," and Dr. Fetterman noted "[h]allucinations denied since being placed on medication." A.R. 539. Plaintiff's working memory was assessed as "on the borderline range," verbal comprehension was low average, perceptual reasoning was average, and processing speed was "extremely low range of intellectual functioning." A.R. 539. She had "an extremely low auditory memory score and a very high visual memory score." A.R. 539.

Dr. Fetterman diagnosed Plaintiff with mood disorder due to general medical condition, cognitive disorder not otherwise specified, and borderline intellectual functioning. A.R. 540. Dr. Fetterman concluded that Plaintiff's ability to understand, remember, and carry out job instructions was moderately impaired and that her ability to maintain attention, concentration, persistence and pace was markedly impaired. Her ability to relate and interact with supervisors, coworkers, and the public as well as her ability to adapt to day-to-day work activities were unimpaired. A.R. 540. Dr. Fetterman opined that Plaintiff "[i]s not able to perform work activities on a consistent basis without special or additional instruction" due to her marked learning impairments. She also opined that Plaintiff "[i]s able to adequately perform one or two step simple repetitive tasks," but not complex tasks due to her marked learning impairments. A.R. 540. She concluded by assessing Plaintiff's prognosis as fair. A.R. 540.

### 3. Dr. Elizabeth Whelchel, Ph.D.

Dr. Elizabeth Whelchel, Ph.D., evaluated Plaintiff on November 7, 2011. A.R. 433-439. Dr. Whelchel noted that Plaintiff's chief complaint was the following: "I had a brain tumor. I hear voices and I'm depressed." A.R. 433. She also told Dr. Whelchel that she was "depressed and frustrated since no longer being able to work due to problems with concentration." A.R. 433. Plaintiff reported being able to take care of "self-dressing, self-bathing, and personal hygiene," complete household tasks and errands as necessary, use public transportation, pay bills, and handle cash appropriately. She reported her hobbies as walking and reading, and stated her relationships with family and friends were "good," and that she can focus attention and has no difficulty making decisions. A.R. 435. On a daily basis, Plaintiff does chores, watches television, interacts with her family, walks, and reads. A.R. 435.

Dr. Whelchel noted that Plaintiff made good interpersonal contact and was "generally

cooperative," appearing genuine and truthful, but she exhibited "some obvious psychomotor agitation in the form of frustration." A.R. 435. Her thought processes were "coherent and organized," and Dr. Whelchel noted that she was non-delusional and that there was no "bizarre or psychotic thought content." A.R. 435. Her mood was depressed, angry, and frustrated, and her affect was appropriate and congruent with her thought content. A.R. 435. As to Plaintiff's intellectual functioning, Dr. Whelchel concluded that Plaintiff was alert and oriented to time, place, person, and purpose, and appeared to be of at least average intelligence. A.R. 436. Her insight and judgment appeared intact. A.R. 436.

Dr. Whelchel diagnosed Plaintiff with adjustment disorder with mixed emotional features, and hallucinations due to a brain tumor. A.R. 437. She concluded that Plaintiff's hallucinations were due to a medical and not a psychiatric problem, and stated her opinion that if Plaintiff "were medically able to work . . . she likely would no longer have any significant mental health issues." A.R. 437. Dr. Whelchel provided a functional assessment of Plaintiff, which she noted did not include the effect of her hallucinations, "as they are considered medical." She also noted that "[Plaintiff's] functional assessment is clearly impacted by hallucinations." A.R. 437. Dr. Whelchel opined that Plaintiff can "understand, remember and carry out <u>simple</u> one- or two-step job instructions" and can do "detailed and <u>complex</u> instructions."[2] A.R. 438 (emphases in original). She also concluded that Plaintiff was only mildly impaired in her ability to relate and interact with coworkers and the public; "maintain concentration and attention, persistence and pace"; and perform work activities without special or additional supervision. A.R. 438.

### 4. Dr. Randy Cochran, Psy.D.

Dr. Randy Cochran, Psy.D., reviewed Plaintiff's records and completed a mental residual functional capacity assessment on March 6, 2012. A.R. 497-499. He concluded that Plaintiff was markedly limited in her abilities to understand, remember, and carry out detailed instructions and interact appropriately with the general public. A.R. 497, 498. He also opined that Plaintiff was

---

[2] When read in context with her full opinion, Dr. Whelchel's opinion that Plaintiff is able to perform "detailed and <u>complex</u> instructions" appears to be a typographical error. There is no indication anywhere else in her opinion or in the record evidence that Plaintiff is capable of detailed and complex instruction work.

moderately limited in her ability to maintain attention and concentration for extended periods. A.R. 497. Dr. Cochran opined that Plaintiff can "perform simple tasks with routine supervision and no public contact[,] . . . can relate to supervisors and peers on a superficial work basis[,] . . . [and] can adapt to a work situation." A.R. 499.

### 5. Dr. Rosemarie Ratto, Ph.D.

In February 2012, Dr. Rosemarie Ratto, Ph.D., performed a psychological evaluation of Plaintiff during which she administered the Wechsler Memory Scale-IV. Plaintiff obtained an auditory immediate memory index of 82 (12%), a visual immediate memory index of 76 (6%), an immediate memory index of 78 (7%), and a delayed memory index of 92 (30%). A.R. 469. Her report contains no analysis of these results.

## IV. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

# V.    DISCUSSION

On appeal, Plaintiff contends that the ALJ erred in (1) weighing the medical opinions and (2) finding Plaintiff not credible.

## A.  The ALJ's Evaluation of the Medical Opinions

Plaintiff first argues that the ALJ erred in weighing the medical opinions.  Specifically, she argues that the ALJ erred in giving no weight to the Dr. Fetterman's opinion.

### 1.  Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient.  Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians").  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion.  *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities.  *Reddick*, 157 F.3d at 722.  A treating physician's opinion, while entitled to more weight, is not necessarily conclusive.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted).  To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons."  *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996). If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion.  *Lester*, 81 F.3d at 830.  The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Reddick*, 157 F.3d at 725 (citation omitted).  "[B]road and vague" reasons do not suffice.

rejection of an examining physician's opinion as well. *Lester*, 81 F.3d at 830-31. A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record." *Sousa v. Callahan*, 143 F.3d 1240, 1244 (9th Cir. 1998). An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2. Analysis

Dr. Fetterman, who examined Plaintiff in October 2012, concluded that Plaintiff's ability to understand, remember, and carry out job instructions was moderately impaired and that her ability to maintain attention, concentration, persistence and pace was markedly impaired. She further concluded that due to Plaintiff's marked learning impairments, she is able to "adequately perform one or two step simple repetitive tasks," and not complex tasks. A.R. 540. She further opined that Plaintiff "[i]s not able to perform work activities on a consistent basis without special or additional instruction." A.R. 540. The ALJ gave no weight to Dr. Fetterman's opinion, writing that her conclusions were "inconsistent with those of Dr. Whelchel" and contradicted by Dr. DeVere's opinion, both of which the ALJ afforded "great weight." A.R. 27, 28.

Plaintiff argues that the ALJ offered legally insufficient reasons to reject Dr. Fetterman's opinion in favor of the opinions of Dr. DeVere and Dr. Whelchel. According to Plaintiff, had the ALJ included Dr. Fetterman's functional limitations in her RFC formulation and hypotheticals to the VE, such limitations would have ruled out Plaintiff's performance of any jobs, including the

United States District Court
Northern District of California

10

jobs named by the VE: cleaner/housekeeper (commercial or institutional), cleaner (manufactured buildings), and hand packager.

Dr. Fetterman opined that Plaintiff 1) was limited to "one or two step simple repetitive tasks"; 2) was markedly impaired in attention, concentration, persistence and pace; and 3) was unable to perform work activities on a consistent basis without special or additional instruction. Pl.'s Mot. 5, 15; *see* A.R. 540. The ALJ rejected these opinions, concluding that Plaintiff retains the mental capacity "to perform simple tasks with routine supervision," "relate to supervisors and peers on a superficial basis," and "adapt to work situations." A.R. 25.

As to Dr. Fetterman's opinion that Plaintiff was limited to "one or two step simple, repetitive tasks," Dr. Whelchel similarly opined that Plaintiff can "understand, remember and carry out <u>simple</u> one- or two-step job instructions." A.R. 438 (emphasis in original). These opinions were contradicted by Dr. DeVere, who concluded that Plaintiff had no mental limitations. Accordingly, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to reject that portion of Dr. Fetterman's opinion. *Lester*, 81 F.3d at 830. The court need not determine whether the ALJ erred in rejecting that portion of Dr. Fetterman's opinion, as it concludes that any error was harmless. This is because even if the ALJ had adopted a restriction to one- or two-step simple, repetitive tasks, the job of cleaner/housekeeper (commercial or institutional), which is one of the jobs identified by the VE as a job that an individual with Plaintiff's RFC could perform, is consistent with that limitation. The Department of Labor's Dictionary of Occupational Titles ("DOT") "describes the requirements for each listed occupation, including the necessary General Educational Development ('GED') levels; that is, 'aspects of education (formal and informal) . . . required of the worker for satisfactory job performance.'" *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015) (citation omitted). GED levels include "the reasoning ability required to perform the job, ranging from Level 1 (which requires the least reasoning ability) to Level 6 (which requires the most)." *Id.* Here, the job of cleaner/housekeeper (commercial or institutional) (DOT 381.687-014) is classified as requiring reasoning level 1, "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these

situations encountered on the job." DICOT 381.687-014, 1991 WL 673257. The Ninth Circuit has explained the "close similarity" between an RFC limiting a claimant to the performance of "one- and two-step tasks" and the demands of Level 1 reasoning. *See Rounds v. Comm'r of Soc. Sec. Admin.*, 807 F.3d 996, 1003-1004 (9th Cir. 2015).[3] This court has also previously noted that a limitation to performing "simple one- and two-step commands" "corresponds with the language in level one of the six-part Reasoning Development scale." *Benavidez v. Colvin*, No. C-13-00158 DMR, 2014 WL 1245643, at *7 (N.D. Cal. Mar. 25, 2014). Plaintiff does not explain how a limitation to "one or two step simple, repetitive tasks" would preclude her from performing a job classified as requiring Level 1 reasoning. The court concludes that any error with respect to this portion of Dr. Fetterman's opinion was harmless.

The ALJ rejected Dr. Fetterman's remaining opinions that Plaintiff was markedly impaired in attention, concentration, persistence and pace and was unable to perform work activities on a consistent basis without special or additional instruction in favor of the opinions of Dr. DeVere and Dr. Whelchel. Dr. DeVere opined that Plaintiff had no mental health-related work impediments, and Dr. Whelchel concluded that Plaintiff was only mildly impaired in her ability to "maintain concentration and attention, persistence and pace" and perform work activities without special or additional supervision. Similarly, Dr. Cochran opined that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods. Given these contradictions, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to reject Dr. Fetterman's opinion. *Lester*, 81 F.3d at 830.

Upon review of the record, the court concludes that the ALJ did not err with respect to Dr. Fetterman's opinion. The ALJ gave two reasons for rejecting Dr. Fetterman's opinion. First, she noted that Dr. Fetterman's opinion was inconsistent with Dr. Whelchel's conclusions, stating "there is no evidence of any decline in [Plaintiff's] cognitive functioning or any exacerbation of her mental health symptoms between the time of Dr. Whelchel's examination [in November 2011]

---

[3] The court notes that a limitation to one- and two-step instruction work is more restrictive than a limitation to simple, repetitive tasks. *Burson v. Berryhill*, No. 15-cv-04991-DMR, 2017 WL 1065140, at *4 (N.D. Cal. Mar. 20, 2017) (discussing *Rounds*, 807 F.3d at 1003-1004).

and Dr. Fetterman's examination [in October 2012]."  A.R. 28.  At the time of Dr. Whelchel's examination in November 2011, Plaintiff complained about depression and frustration due to her no longer being able to work because of problems with concentration.  However, she reported being able to perform a wide range of activities of daily living, including dressing, bathing, taking care of personal hygiene, performing household tasks and errands, using public transportation, paying bills, and handling cash.  She reported that her relationships with family and friends were good and that she was able to focus attention and had no difficulty making decisions.  She also described her daily activities as doing chores, watching television, interacting with her family, walking, and reading.  Dr. Whelchel found Plaintiff's thought processes "coherent and organized," with no "bizarre or psychotic thought content."  Although her mood was depressed, angry, and frustrated, Dr. Whelchel concluded that Plaintiff was alert and oriented to time, place, person, and purpose, and appeared to be of at least average intelligence, with intact insight and judgment.

Four months later, in February 2012, Dr. Edie Y. Glantz, M.D., performed an internal medicine evaluation of Plaintiff.  A.R. 470-478.  Dr. Glantz noted that Plaintiff's seizures "have been well-controlled" with medication and that she "ha[d] no other specific complaints."  A.R. 471.  Similarly, progress notes dated March 2012 from San Francisco General Hospital indicated that Plaintiff had experienced "significant improvement" with hearing voices and feeling a pulling sensation in her scalp.  Plaintiff also reported feeling that her memory difficulties had stabilized and that she felt "less paranoid."  A.R. 520.  Despite these reports of improvements by Plaintiff in early 2012, Dr. Fetterman examined Plaintiff later that year and assessed marked impairments.  Notably, there is no evidence that Plaintiff sought or received treatment in connection with her seizures or mental health issues after March 2012.  The court finds that the ALJ reasonably concluded that the lack of evidence of any decline in Plaintiff's cognitive functioning or mental health symptoms during the year between the psychological examinations undermined Dr. Fetterman's conclusions about Plaintiff's functional limitations.  Further, Dr. Whelchel's opinion alone constitutes substantial evidence to reject Dr. Fetterman's opinion, since it rested on her own independent examination of Plaintiff.  *See Tonapetyan*, 242 F.3d at 1149.

The ALJ also noted that Dr. Fetterman's opinion was contradicted by Dr. DeVere's

opinion, to which she afforded great weight.  A.R. 28.  The ALJ stated that Dr. DeVere's opinion was based upon a review of the record in its entirety and was supported by the objective medical evidence of record.  A.R. 27.  Opinions of non-examining physicians may "serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  While the ALJ could have discussed the record evidence supporting Dr. DeVere's opinion in greater depth, the court finds no error in the ALJ's decision to give great weight to Dr. DeVere's opinion.  As discussed above, the record contains evidence that Plaintiff had reported in February 2012 that her seizures were "well-controlled" with medication.  She also reported what she described as "significant improvement" in her symptoms in February and March 2012.  At the hearing, Dr. DeVere testified about Plaintiff's seizure disorder, noting that there was no record evidence about the frequency with which Plaintiff had experienced seizures.  A.R. 78.  He also discussed the testing Plaintiff underwent with Dr. Fetterman in October 2012, stating that Plaintiff had had "a good battery of neuro psych testing" and that "she was functioning pretty good cognitively."  Based on that testing, Dr. DeVere concluded that notwithstanding Plaintiff's psychological issues, "there was no cognitive reason why she couldn't do a job."  A.R. 79.  In other words, based on his own interpretation of Dr. Fetterman's test results and his review of Plaintiff's medical records, Dr. DeVere concluded that Plaintiff's cognitive impairments did not significantly impact her ability to work.  Plaintiff disputes Dr. DeVere's interpretation of Dr. Fetterman's test results, but does not point to any other evidence in the record that supports Dr. Fetterman's findings that Plaintiff is markedly impaired in several areas of mental functioning.  The court finds that the ALJ provided adequate reasons supported by substantial evidence for rejecting Dr. Fetterman's opinion.

## B.    The ALJ's Credibility Determination

Plaintiff next appears to challenge the ALJ's determination that she was not fully credible.  She asserts that the ALJ's credibility assessment is "generally defective" because she "failed to acknowledge Plaintiff's exemplary work history."  Pl.'s Mot. 15.  Specifically, Plaintiff argues that she has an excellent work history, with covered earnings for 31 consecutive years.  *See* A.R. 236-37.  She argues that her excellent work history "is a factor that lends to her credibility" and

should have been considered as part of the RFC assessment. Pl.'s Mot. 16.

Under applicable authority, the ALJ's credibility determinations "must be supported by specific, cogent reasons." *Reddick*, 157 F.3d at 722 (citation omitted). If an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id.* at 972 (quotations omitted); *see also Thomas*, 278 F.3d at 958 (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). If a claimant produces medical evidence of an underlying impairment and there is no affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014).

Plaintiff appears to acknowledge this authority, stating that she understands why "courts are generally reluctant to overrule the credibility findings of an ALJ . . . and generally agrees with those reasons." Pl.'s Mot. 15. However, her position on this issue is not clear, as she does not discuss the ALJ's credibility finding or identify or take issue with any of the reasons provided by the ALJ for discounting Plaintiff's credibility. She also provides no authority that an ALJ's failure to consider a claimant's "excellent work history" in his or her credibility determination constitutes reversible error. Here, the ALJ identified a number of reasons for discounting Plaintiff's testimony, including her own statements about her activities of daily living, which were corroborated by her cousin's reports; medical records indicating improvement in her symptoms with medication; treatment records; and failure to seek or receive mental health treatment. A.R. 28-29. Again, Plaintiff does not discuss or explain how any of these reasons are insufficient. The court concludes that the ALJ did not err in concluding that Plaintiff's testimony was not fully

1   credible.

2   **VI.     CONCLUSION**

3     For the foregoing reasons, Plaintiff's motion for summary judgment is denied.  The

4   Commissioner's motion for summary judgment is granted.

5

6      **IT IS SO ORDERED.**

7   Dated: August 28, 2017

8   

9          Donna M. Ryu
       United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California